JUDGE WILLIAMS
delivered the opinion op the court:
We have not deemed it essential to inquire whether the 15th section, 4Jh article, of the city charter of Louisville, is in conflict with 5th article of the State Constitution, which gives to the “ House of Representatives the sole power of impeachment,” or section 35, article 4, which provides that the county oiflcers “shall be subject to indictment or presentment for malfeasance or misfeasance in office, or willful neglect in the discharge of their official duties, in such mode as may be prescribed by law, subject to ap *178 peal to the court of appeals; and, upon conviction, their offices shall become vacant.”
As the first provision includes all civil officers, and the latter all the county officers, there is much reason to infer that it was intended no officer should be ousted in any other way from the discharge of the duties and reception of the emoluments of the office.
But however this may be, by section 15, article 4, city charter, 82, the board of aldermen could only become a court to try charges preferred against a city officer upon being duly sworn; and being a court of the most limited jurisdiction — indeed, having jurisdiction, as a court, only for the purpose of the trial and removal of officers— every thing essential to make it such a court must appear affirmatively, and no intendment or presumption in its favor can be indulged.
The record shows that eleven of the aldermen were sworn by “ Esquire Clementsand afterwards, another alderman coming in, reported he had also been sworn by Clements before getting to the hall. The board then, on consultation, determined to be sworn again, and were sworn by their clerk, who wds also a notary public.
Whether Esquire Clements was a notary public, or some other kind of officer, or no officer at all, does not appear; and, even if he was, the board abandoned tl^p oath administered by him, and organized under the oath administered by their clerk and notary public.
We have found no provisions in the city charter nor general statutes authorizing the clerk of said board to administer oaths. Therefore, on this branch of the subject, we are left to the inquiry how far a notary may administer such an oath.
The Constitution recognizes such officers as mayors of cities and other police officers.
*179 By section 2, Schedule Constitution, it is provided, that “ the oaths of office, herein directed to be taken may be administered by any judge or justice of the peace until the General Assembly shall otherwise direct.”
By section 11, chapter 71 (2 Stant. Rev. Stat., 191), it is provided, that “ the official oath of any officer may be administered by any judge or justice of the peace.”
Section 1, article 8, Constitution, prescribes the oath to be taken by “ all officers before they enter upon the execution of the duties of their respective offices,” and is the oath referred to in the schedule to the Constitution and Revised Statutes.
These aldermen could only become judges and sit as a court, even for the special purpose of trying charges against an officer, by taking said oath, and that administered by an officer with competent authority.
By section 611, Civil Code, affidavits may be made before notaries public.; but section 612 defines what are affidavits, which does not include official oaths.
Both the Constitution and laws recognize a difference between official oaths and affidavits, and this was deemed of so much importance as to require a constitutional declaration who should administer such oaths until otherwise provided by law; and the Legislature has deemed it to be of sufficient importance to designate who shall administer official oaths, and certainly did not intend that those officers should be enlarged without an explicit provision.
If this be correct, the notary had no legal authority to administer the official oaths to those aldermen, and thereby make them judges; and for want of a duly administered oath they did not become judges, nor did their body become a court; hence their proceedings as a court were wholly illegal and void. Had they been a regu *180 larly constituted court, it would have been for the purpose of trying the mayor- — Tompert—upon charges preferred by the council; and therefore it is essential to determine whether Tompert had been charged by said council.
Charges signify an accusation, made in a legal manner, of illegal conduct, either of omission or commission, by the person charged. We are therefore bound to look into the charges as preferred, and the specifications, to see whether there was a charge of illegal conduct by the mayor; for if none such were made, then no cause existed for said court to try.
If there had been a legal court, and legal charges against the mayor for illegal conduct, we could have nothing to do with its decision, however erroneous, only by appeal, which we have no doubt could have been done, and not on a proceeding of the character now before us.
The general council of the city, consisting of the common council and board c*fi aldermen, had passed this resolution : “ Resolved, that the mayor is authorized to have prepared by the assistant city attorney, and' he is authorized to sign, and he is authorized to execute, a contract with Isham Henderson and his associates,” fyc.
This resolution the mayor returned, with his objections in writing, when each board of the general council again passed it by the required majority of all the members elect. The common council consisted of twenty-four members, and the resolution was passed over the mayor’s veto by thirteen ayes to ten nays. This was on November 16, 1865.
December 5th, 1865, the mayor sent in another message to the general council, stating the reasons why he had declined executing the contract contemplated by the resolution.
*181 1. Because he had learned since its passage that improper influences had been used as to one of the board of common council, and presented the affidavits upon which his suspicions were predicated; that without his vote the resolution had not passed, and suggested that the integrity and purity of the body required that this matter should be investigated.
2. That Mr. Henderson had produced no authority from his numerous associates to bind them.
3. That Mr. Henderson had taken back the writings by which, as president of the Portland Railroad Company, it was to make certain concessions to the city; upon the reception of which message the common council immediately preferred charges against the mayor as follows :
“ Refusing to discharge the duties of the office of mayor of Louisville.
“ SPECIFICATIONS.
“ That the general council of the city of Louisville, in the month of-, 1865, duly and legally passed certain resolutions, accepting a proposed contract with certain amendments between the city of Louisville and Isham Henderson, for himself and his associates, for a street railway along Market street, and other streets in the city of Louisville, and directing said contract to be accordingly prepared by the assistant city attorney, and when so done, the same to be entered into, signed and acknowledged, by the said Philip Tompert, as mayor of the city aforesaid, for and in the name of said city ; which resolutions were vetoed by said mayor, but were, notwithstanding, afterwards duly and legally adopted by each board of said general council, and thereby became the law and in full force; after which, said contract was reduced to writing by the assistant attorney, as directed by, and in conformity with, the terms of the resolution aforesaid; *182 and being so reduced to writing, and duly and legally signed by said Isham Henderson, for himself and his associates, was, in due time and properly, presented to said Philip Tompert, as mayor aforesaid, to be entered into and signed and acknowledged by him as such mayor, and for and in the name of said city of Louisville, which he has unlawfully, and without cause, refused, and still unlawfully and without cause, refuses to do, thus disregarding, failing, and refusing to carry into effect the lawful orders and requests of the general council of the city of Louisville, and thus refusing to discharge the duties of his office of mayor of the city of Louisville;” which charges and specifications were also carried by a bare majority of the members elect, the councilman thus charged voting in the affirmative.
The language of the message is respectful, and the reasons urged seem to be of the weightiest character, and he does not therein even intimate that he would finally decline to execute the contract; but had merely postponed its execution until the matters therein could be brought to the notice of the general council for its action.
The affidavits presented with the message raised a prima facie presumption, at least, that a councilman had been corrupted, and, when coupled with the further offer by the mayor to produce other testimony to establish the fact, his action was certainly not illegal, as by said section 15, city charter, he had the right to make charges against any officer; and although the board might not deem it necessary to vindicate its own integrity by an investigation, yet this did not make the mayor’s conduct illegal.
The fact that the resolution was passed over the veto by this councilman’s vote, and that he voted for charging the mayor, and with it the charges were only made by a *183 bare majority, gives to this case a most extraordinary aspect.
The other questions presented in his last message by the mayor were of the gravest legal character, involving important interests of the city, and manifests in him a watchful, legal vigilance as to the city’s interest, instead of a disregard of official duty. Nor can we perceive how the city’s interest could suffer by a delay in the execution of said contract until these questions could be acted on by the general council, especially as other parties were then seeking a contract to extend the street railroads; and unless this had been made apparent, it is hard to perceive the illegality of the mayor’s conduct; and this is not charged in the specifications.
We are of opinion that the board of aldermen, as organized, was not a legal court authorized to try Mayor Tompert, and that the message, charges, and specifications preferred, made out no charge of official delinquency, and their proceedings, by which he was ousted, were illegal and void. There was, therefore, no vacancy in the office of mayor for the general council to fill, and appellee Lithgow, in legal contemplation, became an usurper when he entered upon the discharge of the duties of mayor under their appointment.
Wherefore, the judgment below is reversed, with directions for further proceedings not inconsistent herewith.