## City of Lexington v. Thompson et al.

(Decided June 23, 1933.)

97

J. PELHAM JOHNSTON, CLINTON HARBISON, RICHARD C. STOLL and ROBERT H. WINN for appellant.

GROVER C. THOMPSON, LON ROGERS and LEER BUCKLEY for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and defendant below, city of Lexington, is a municipality of the second class. Chapter 91, p. 310, of the Acts of 1930, now sections 3235dd-16 to and including 3235dd-52 of the 1933 Supplement to Carroll's Kentucky Statutes, is an amendment to charters of cities of the second class in this commonwealth (or a supplement thereto) by which that class of cities is authorized and empowered to adopt and put into execution a "City Manager form of government," for which the act provides, and it prescribes the duties of the city manager as well as his qualifications and the method of his choosing, which is by election by the city board of commissioners where that form of government has been adopted, or by the city council where the commissioner form of government has not been adopted. Pursuant to that authority, after following the methods prescribed in the act, the city of Lexington adopted the city manager form of government provided by it, and its commissioners then enacted what is designated in this record as Ordinance No. 2, whereby the present incumbent, Paul Morton, was elected to the place, and his salary was fixed at $10,000 per annum.

This action was later brought by appellees and plaintiffs below, as citizens and taxpayers within the city, for themselves and others similarly situated, against the city, its board of commissioners, and the city manager, as defendants below, seeking to have the court declare the statute, and the ordinance enacted pursuant thereto, void and unconstitutional in so far as they conflicted with the provisions of section 246 of our Constitution, expressly limiting the compensation of all "public officers," except the Governor, to the sum of $5,000 per annum. It is contended by plaintiffs, and was so expressly alleged by them, that the city manager of the city of Lexington was and is an officer, notwithstanding the statute, supra, creating the position and making provisions for filling it, expressly enacted to the contrary in its section 17, now section 3235dd-32, saying that he "shall not be an officer or official of the city but the executive agent of the mayor and board of commissioners in the management of city affairs"; and, notwithstanding the statute expressly enacted in the following section 18 of the act (section 3235dd-33 of the Supplement to the Statutes) that the choice of a city manager shall not be limited to inhabitants of the city or state and that he "shall be employed for an indefinite period."

Defendants' demurrer filed to the petition was overruled, whereupon they answered and denied the interpretations of the constitutional provision and of the statute, as averred in plaintiffs' pleading, and in a second paragraph it eulogized (perhaps correctly so) the efficiency of the city manager form of municipal government over the former Bi-cameral form theretofore prevailing, and alleged that the Legislature in enacting the statute was justifiably moved to do so in order to enable such cities to reap the superior advantages portrayed, and that in doing so no constitutional provision was violated. The demurrer of plaintiffs filed to the answer was sustained, and upon defendants declining to plead further judgment was rendered sustaining the prayer of the petition and enjoining defendants from paying Mr. Morton, as city manager, a salary exceeding $5,000 per annum, and complaining of that judgment, defendants prosecute this appeal.

It will at once be seen that the decisive questions

in the case are: (a) Whether the position of city manager created by the statute is or is not a public office, and if that question should be answered in the affirmative, then (b) does the constitutional provision apply to municipal officers? Other collateral and incidental questions of more or less pertinency to a correct answer of the two designated ones will receive consideration and be disposed of as the opinion proceeds.

The correct answer to question (a) is difficult to frame so as to clearly indicate the line separating the position embraced by the term "office" and so as to classify its incumbent as an officer, and a position wherein the incumbent is commonly known and understood as a mere agent or employee. Notwithstanding that difficulty, most any citizen of fair education and average intelligence, whether a member of the legal profession or a layman, can determine the proper classification in a given state of facts, and especially so where the controlling differentiating ones are not so intermingled as to dim and obscure the line of demarcation. Their ability to do so arises from the fact that the words "office" and "officer," as well as the words "agent" and "employee," have now, and did have at the time of the adoption of our Constitution, and long prior thereto, definite and well-understood meanings which were comprehensible to the average mind; but, nevertheless, difficult to precisely define in a manner to always make visible the line separating the one class from the other. Law-writers and courts in defining that position known in the law as an "office," and its incumbent as an "officer," have suggested some incidents which are usually found as attaching to the position, but the presence of some of which it is universally declared are nonessential, although they are usually incident to the position of an *office* or to an incumbent as an *officer*. The Supreme Court of Montana in the case of State ex rel. v. Hawkins, 79 Mont. 506, 257 P. 411, 418, 53 A. L. R. 583, had the question before it and it wrote a most exhaustive and researchful opinion in which cases from many of the courts of the several states are referred to, as well as the definition given by recognized text writers, and from all of which it deduced the definition it gave of an "office" or an "officer," and which comprehended the essentials as

well as referred to the nonessential ones, but which latter are usual signs or indicia attendant upon and attached to such public offices. Its definition was and is: "After an exhaustive examination of the authorities, we hold that five elements are indispensable in any position of public employment, in order to make it a public office of a civil nature: (1) It must be created by the Constitution or by the Legislature or created by a municipality or other body through authority conferred by the Legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the Legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they be those of an inferior or subordinate office, created or authorized by the Legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity, and not be only temporary or occasional. In addition, in this state, an officer must take and file an official oath, hold a commission or other written authority, and give an official bond, if the latter be required by proper authority."

Similar definitions, as given by other courts, are contained in that opinion; but we cannot devote either the time or the space to insert them, or even the cases in which they were pronounced, but refer the reader to that opinion for such information. It will be perceived, and which we are convinced is true, that a public service position, in order to be an office so as to make its incumbent an officer, must be created by the Constitution, or the Legislature or a municipality under authority conferred by the Legislature. It must possess or contain a delegation of a portion of the sovereign power of government to be exercised by the incumbent for the benefit of the public, and the powers and duties must be defined by the authority creating the position, and must be performed by the incumbent independently and without control of any superior public power or authority other than that contained in the law creating the position, except the functions of a deputy officer, where the law provides for one, who acts under the

direction and control of his principal and in the latter's name. The position also must have some permanency and continuity, which means that the office itself is one of permanency and continuity, but which terms do not refer to the length of time that the incumbent may or may not serve in that capacity; for the law creating the position might be so framed as to provide for an indefinite or a very short tenure of the individual occupant, yet the public position would continue in force until it is repealed or in some manner dispensed with by the authority that created it. Thus we see that the invariable and certain characteristics of an office, so as to render its incumbent an officer, is one that must emanate from the sovereignity and involve the performance of some sovereign governmental duties which the incumbent may exercise on his own initiative and not be circumscribed by directors and orders from some superior source other than those found in the law creating the office.

Most generally the incumbent is required to take an oath and sometimes required to execute a bond, and usually required to be an inhabitant of the territory or political unit that he serves; but such incidents furnish no certain criteria for the classification of the position, or to the status of the one who fills it. But even if they did, and an office had been created as measured by the definition supra, but with an express requirement that such usual incidents need not be complied with and were not requisites, it would not necessarily follow that the incumbent would not be an officer, since the only result in that case would be that the Legislature exceeded its authority in so dispensing with such incidents, and it would not have the effect of converting the position from that of an *office* to one of a municipal *agent* or *employee*. The incumbent in that instance, who did not possess or who had not complied with the requisites that the Legislature had attempted to dispense with, would nevertheless be a de facto officer, although he might by reason thereof be deprived of the right to function as a de jure one, and which questions shed no light upon and are not controlling in determining the true and correct status of the position.

Domestic cases, approving the definition supra of the Montana court in the Hawkins Case, are City of Louisville v. Wilson, 99 Ky. 598, 36 S. W. 944; Pratt

v. Breckinridge, 112 Ky. 8, 65 S. W. 136, 137, 66 S. W. 405, 23 Ky. Law Rep. 1356, 1858; Commonwealth v. Bush, 131 Ky. 392, 115 S. W. 249; Schwalk's Adm'r v. City of Louisville, 135 Ky. 571, 122 S. W. 860, 25 L. R. A. (N. S.) 88; Hermann v. Lampe, 175 Ky. 109, 194 S. W. 122; Board of Education v. Scott, 189 Ky. 225, 224 S. W. 680; Barrow v. Bradley, 190 Ky. 480, 227 S. W. 1016; Shanks, Auditor, v. Howes, 214 Ky. 613, 283 S. W. 966, and others referred to in those opinions. It could serve no useful purpose, but require a sacrifice of space and time, to incorporate excerpts from those opinions giving the exact language of this court in its definition of what is required to constitute an office so as to make its incumbent an officer. Suffice it to say that the one so given is in substantial accord with the Montana court in saying that it must be a position created by law in the manner approved thereby; that it must put upon the incumbent the right to exercise, independently of any supervision by any superior, portions of the sovereign governmental power; that the position must be one of permanence or continuity and not only temporary or occasional performance of duties; and that the manner and extent of the performance of such duties must be prescribed and limited, either directly or indirectly, by statute or some constitutional provision.

A text authority to the same effect is 22 R. C. L. pp. 372-374. In the text beginning with section 2 on the first page referred to it is stated: "But the taking of the oath is a mere incident to office, and the absence of such a requirement does not necessarily negative official character, and the same is true of the failure to reqire any bond. It may here be noted that an 'office' is a legal entity, and may exist in fact, although it is without any incumbent." That excerpt fortifes our prior statement that such requirements relate exclusively to the incumbent as an officer, and not to the position or office that he occupies, and confirms our statement that the word "tenure" as an element of the definition relates to the office and not to the incumbent. See, also, the text in 46 C. J. p. 922, sec. 2, where the author thereof describes the same *certain* characteristics of an office as are embraced within the definition of the Montana court in the Hawkins Case, supra, although that defiinition, as well as that given

by other writers on the subject, also say that "the term embraces the ideas of tenure, duration, emolument and duties, and certain of these ideas are more or less emphasized in the many other definitions of the term given by the courts and text-writers." Numerous cases and texts are referred to in the notes and they are all in unison with the Montana definition, and are likewise in unison upon the point that "tenure" and "duration" are terms applicable to the *office* and not to the length of the service therein by the incumbent, which may be temporary and measured by no fixed period or certain standard, and yet the position itself would be an "office" and the incumbent, while serving therein, would be an "officer"; provided, of course, the duties were such as are enumerated in the definition and were prescribed and the place created by the Legislature, or the constitution, either directly or indirectly. A late supporting case is State v. Fousek, 91 Mont. 448, 8 P. (2d) 791, 84 A. L. R. 303, and see, also, annotation in the latter publication beginning on page 309.

Having said so much, we turn now to a consideration of the statute creating the position of city manager for cities of the second class, which are contained in the statutes hereinbefore referred to. In doing so we find that the incumbent is designated by the statute as "the executive agent of the mayor and board of commissioners in the management of city affairs." Section 3235 dd-32. The same section then proceeds to take away from the mayor, the board of commissioners, or any member thereof, the right to dictate the appointment of any person to office under or employment by the city manager, "or in any manner interfere with the city manager or prevent him from exercising his own judgment in the appointment of officers and employees in the administrative service." It does, however, expressly permit such city officers to deal with the administrative service "solely through the city manager," but "neither the board of commissioners, nor any member thereof shall give orders to any of the subordinates of the city manager, either publicly or privately." It then proceeds to make such prohibitive interference by such officers a misdemeanor punishable by fine and imprisonment. Section 3235dd-35 of the Statutes, and which is section 20 of the act, defines the power and duties of the city manager, which we will

not attempt to enumerate in this opinion (since the information may be obtained by reading the statute itself), but they will be found to be the lion's share of municipal governmental duties, including the appointment and removal of policemen, firemen, and other city officers and employees. In short, to use a current but expressive phrase, he is made by the statute practically "the whole cheese" in the running of the city government and, as we have seen, it is made a misdemeanor for the officers who heretofore performed those duties to interefere with him. In addtion he is empowered to administer oaths to his appointees, some of the recipients of which are undoubtedly officers. Furthermore, the section of the statute prescribing his duties (section 3235dd-35) makes it mandatory upon the board of commissioners upon the written advice or request of the city manager to create "such administrative departments" for the city "as in the judgment of the board, are reasonably required for the efficient, orderly and economic administration of the business affairs of the city."

Under the Statutes the city manager must prepare the city budget for each of its fiscal years, and it makes him responsible for the proper administration of all the affairs of the city appertaining to the powers and duties conferred upon him. Surely, it could not logically be contended that one possessing such broad governmental powers is not an *officer* but is only an *agent* or *employee*. An agent is never superior in his authority to his principal, and he works and performs in subordination to the latter. He is, so to speak, an actor only for and on behalf of his principal and his authority never rises higher than that of his principal; but which is untrue, as we have seen, with reference to the office of city manager of cities of the second class, and his supposed principal composed of the mayor and the board of city commissioners of the city. Therefore, under the very definition and characteristics of an agent the city manger cannot be classified as such, independently of his true designation arising from the nature and extent of the governmental duties entruted to him and their performance by him. He cannot be classified as an employee, since that relationship, like that of agency, arises from and grows out of contract, and the performance of the duties assumed by the con-

tractee are ended when the job is completed. In other words, the functions performed by the contractee are not done by one occupying the place of permanent duration, but only by one who is temporarily hired to perform the particular duty, and which may never become an official duty, howsoever continuous the employment might endure. Neither does such an employee possess any such latitudinous and unrestrained power and authority, but only such as is required to perform the particular thing for which he may be hired.

Independently, however, of such conclusion drawn from such judicial definitions, the Supreme Court of Arkansas, in the case of McClendon v. Board of Health of City of Hot Springs, 141 Ark. 114, 216 S. W. 289, 291, had before it for determination the exact question now under consideration and which arose from a statute of practically the same import and intended to accomplish the same purpose as the one that the city of Lexington adopted, and under which it is now conducting the affairs of its city government. The question in the Arkansas case was, whether a city manager possessing such power was or was not an officer? It was presented in a different form than the manner of presentation in this case, but nevertheless the court was called upon to determine the status and correct classification of the city manager for the city of Hot Springs in that state. After considerable discussion and references to the same character of definitions that we have discussed, that court concluded "that the position of city manager is an office, and that the person appointed by the commissioners to exercise its functions and duties is an officer." Also compare State v. Sheldon, 29 Wyo. 233, 213 P. 92, an opinion by the Supreme Court of the State of Wyoming, in which the opinion expresses the same views. We, therefore, conclude that there is no escape from the conclusion that the city manager for cities of the second class in this commonwealth is an officer and not an agent or employee.

But it is argued, conceding the correctness of that conclusion, that (b) the involved section of the Constitution does not apply to municipal officers. We deem it necessary to devote but little space or time to that contention. We held otherwise in the case of Carrol v. Fulletron 215 Ky. 558, 286 S. W. 847. An extended analysis of the principles underlying that con-

clusion would establish its undoubted soundness, which we think is not required, since the broad and comprehensive language of the involved section of the constitution (246) is not susceptible to the construction that its provisions were confined solely to state officers and had no application to county or municipal ones. Its language is "no public officer" shall receive more than $5,000 per annum as compensation, except the Governor, and it can hardly be conceived that the convention intended to discriminate in that respect between state officers and those of subordinate political divisions. Moreover, we held in the cases of Shipp v. Rodes, 196 Ky. 523, 245 S. W. 157; Holland v. Fayette County, 240 Ky. 37, 41 S. W. (2d) 651; and Commonwealth v. Coleman, County Attorney, 245 Ky. 673, 54 S. W. (2d) 42, that the provision applied to sheriffs, jailers, and county attorneys, all of which were county officers, and if they are embraced within the phrase 'public officers,' as employed in the section of the constitution, then there could be no logical reason why municipal officers were not likewise embraced.

See, also, the case of Board of Education of Boyle County v. McChesney, 235 Ky. 692, 32 S. W. (2d) 26, which is also authority for the proposition that the city manager in this case is an officer, since we held therein that a county superintendent of public schools, who is elected by the county board of education under our present statute, was and is an officer and not a public agent or employee, notwithstanding the statute does not prescribe his residential qualifications at the time of his election. That statute permits an incumbent of that office to be selected who may not be a resident of the county at the time, and which is an indirect determination that section 234 of our organic law, saying "All civil officers for the state at large shall reside within the state, and all district, county, city or town officers shall reside within their respective districts, counties, cites or towns, and shall keep their offices at such places therein as may be required by law," does not necessarily refer to "residence" at the time of election. It was inferentially held in the McChesney Case that the section referred to the time when the incumbent commenced the discharge of his official duties and during the time he continued to perform them. But, if it were otherwise, then the city manager statute

under consideration could not otherwise prescribe as is attempted in that act, and the effort to do so would be of no avail, resulting in, the right of second-class cities to adopt and administer the statute with that provision ignored, just as must be done with the provision in the statute that he city manager "shall not be an officer or official of the city," which brings us to the point so earnestly discussed in briefs of learned counsel for the city that there is no constitutional provision inhibiting the legislature from so prescribing. Their argument is, that the Legislature has all power not inhibited by that instrument, from which premise they deduce the conclusion that the Legislature may legally enact that a position which is inherently and by all legal definitions an office, is and shall not be one.

During the course of that argument learned counsel ask us to "put our fingers on the constitutional provision prohibiting such action on the part of the legislature." The answer is much more difficult than is the ability to discern the fallacy of thec ontention; growing out of the fact that the simplest questions are sometimes the most difficult to answer, because of the simplicity. Of course, there is no express constitutional provision saying that the Legislature shall not enact an altogether different meaning of a word employed in the Constitution or attribute to it a different significance from the one that the constitutional makers intended. But because of the absence of such an expressed inhibition it does not follow that the right of the Legislature to do so exists any more than it would possess the right to enact that the moon is not a heavenly body and does. not give light at night, and for its statutory defiinition to be accepted as the fact, contrary to the scientifically true one. It is hornbook law that in interpreting Constitutions the words employed therin should be given the meaning and significance that they posses at the time they were employed, and the one that the delegates of the convention that framed the instrument, and the people who voted their approval of it, intended to express and impart. At that time, and now, the word "office" had a specific significance, and it comprehended the performance of certain public duties by an incumbent, known and understood as an "officer." Such meaning became as much a part of the Constitution as if it had been so *expressly* written in one

of its provisions, and which, if it had been done, would have been an express inhibition against the right of the Legislature to define words and terms as employed in the Constitution as comprehending an entirely different meaning than its makers intended. Such is our answer to the challenge, which we think is in conformity with the universal rule and is supported by most convincing logic.

The argument is attempted to be supported by the cases of United States v. Standard Brewery, 151 U. S. 210, 40 S. St. 139, 64 L. Ed. 229, Ruppert v. Caffey, 251 U. S. 264, 40 S. Ct. 141, 64 L. Ed. 260, and Rhode Island v. Palmer, 253 U. S. 350, 40 S. Ct. 588, 64 L. Ed. 946, in which the Supreme Court sustained the right of Congress in enacting what is commonly known as the Volstead Act (27 USCA) to prescribe a definition of the word "intoxicating," as employed in the Eighteenth Federal Amendment to the Constitution of the United States. That amendment prohibited the manfacture, transportation, and sale of *intoxicating* liquors for beverage purposes. It did not define what was or what was not an intoxicating beverage. The word was one of variable meaning and had not acquired a standard and fixed definition, or, if so, it was not revealed in the amendment the degree of intoxication that the beverage, to which the word was applied, would produce and the intended one against which the prohibition was directed. The question was somewhat similar to that wherein the parties to a contract may stipulate for liquidated damages because of the difficulty and uncertainity attendant upon violations of the contract. No court had defined the word "intoxicating," and it possessed no standardized or measured significance as did the words "office" and "officer" at the time of the adoption of our Constitution. Such differentiating facts render those decisions entirely inapplicable and for which reason they cannot be considered in point.

The argument of counsel carried to its logical conclusion would result in vesting the Legislature with power to destroy and annul the Constitution under which it serves by enacting definitions of words and terms therein employed entirely at variance with their actual meaning and diametrically opposed to the one attributed to them by those who made and approved that document. It would, therefore, appear to be ax-

iomatic that no such power and authority is possessed by the legislative body.

Lastly, it is contended that we held in the case of City of Owensboro v. Hazel, 229 Ky. 752, 17 S. W. (2d) 1031, that a city manager statute, couched in the same language as the one under consideration, was constitutional, and which opinion it is contended is conclusive of the questions involved here under the doctrine of stare decisis. If the questions involved in that case, and only which we determined, were the ones involved here, we would readily agree with learned counsel. But neither the ordinance here involved or a like one nor any provisions of the statute then under consideration, as it affected the provisions of section 246 of the Constitution, were involved in that case. The only questions there presented and determined were: Whether or not it was competent for the Legislature, under sections 23, 107, and 160 of the Constitution, to create the office of city manager? And we held that the act did not violate any of those sections for reasons stated in the opinion. But we therein expressly referred to the position of city manager under the statute as being "an office" and the incumbent therein as being "an officer," although those questions were not presented in direct form. It is true that we said nothing in that opinion about the right of the Legislature to prescribe otherwise in the statute, since that question was not presented, nor was any question of salary or compensation presented or involved in that case. The reference by us to the *position* in that case as being an *office* and its incumbent as an *officer* calls our attention to the fact that the very statute now under consideration in section 3235dd-33 refers to the position of city manager as that of an "office" when it says (referring to the trial of charges that might be preferred against him), "but during such hearing the board of commissioners may suspend him from *office.*" Later in the same section it says: "During the absence or disability of the city manager the board of commissioners shall designate some properly qualified person to perform the duties of *the office.*" (Our emphasis.) Surely those expressions should be given at least the same effect as the prior enacted one that the position should not be an office. But, however that may be, as affecting the legislative intent on that subject, we are

convinced that the Legislature possessed no such power and authority for the reasons hereinbefore stated.

In conclusion we might indorse all that learned counsel say in their praise of the superior benefits of a city manager form of government over the prior bicameral one. But that argument cannot prevail to cause us to depart from our plain and manifest duty to uphold equally plain and unambiguous provisions of our Constitution. In making that argument learned counsel dissertate upon the danger incident to the nullification of statutes by courts on the ground of their unconstitutionality, and with all of which we heartily agree. But, on the other hand, it should not be overlooked that there is a growing disposition throughout the country to put aside entirely the organic law and to make the declarations of the Legislature the Constitution of the sovereignty over which it presides, similar to that of the acts of the British Parliament. In all cases of doubt the suggestion of learned counsel should furnish the guiding rule for the courts, but when the involved provision of the Constitution is free from doubt and is couched in terms of unmistakable meaning and import, it is the duty of courts to say so, and to overturn any statute violative thereof. Such is our view of the question before us. The argument in favor of the city manager form of government is and would be a most persuasive one in favor of an alteration of the involved constitutional provisions, but as long as it remains a part of our organic law there is no escape from a strict adherence to it.

It results, therefore, that the provisions of the statute prescribing that the city manager of Lexington is not an officer, or that the position he fills is not an office, is of no force or effect, and also that the ordinance (No. 2) of the board of commissioners for the city, fixing the salary of its city manager at $10,000 a year, is likewise unauthorized and nonenforceable as to the excess thereof over and above the sum of $5,000.

The trial court having so adjudged, its judgment is affirmed.

The whole court sitting.