## Rawlings v. City of Newport et al.

(Decided Nov. 1, 1938.)

184

186

CHARLTON B. THOMPSON for appellant.
CARL EBERT for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

Appellant, John T. Rawlings, was appointed City Manager of Newport, Kentucky, a city of the second class, in January, 1936. He was elected to this office by the affirmative vote of the mayor and two members of the Board of Commissioners, the other two commissioners voting negatively. Rawlings served in this ca pacity unmolested until the early part of January, 1938. In the November election, 1937, the two commissioners, who had voted with the mayor to elect Rawlings as City Manager in 1936, were defeated, and the two who opposed his election were re-elected. The mayor was elected for a four year term in November, 1935. When the new commissioners, appellees, went into office January 3, 1938, they immediately attempted to remove Rawlings as City Manager. J. Bailey Morlidge, one of the appellees, was designated as Acting City Manager. The

mayor voted to retain Rawlings in office. On the same day (January 3) that the commissioners attempted to remove Rawlings from office he filed a written demand for charges and a public hearing as authorized under section 3235dd-33 of the Statutes. Having resolved to file the charges against Rawlings, the commissioners, the mayor voting "No," suspended Rawlings without pay, pending the hearing of the charges. At the January 3rd meeting the Board of Commissioners adopted a resolution (No. 279) creating and appointing a Board of Inquiry under section 3235dd-36 of the Statutes, "to ascertain the financial status of the City of Newport, Kentucky, and general condition of all various administrative departments thereof."

Following the action of the commissioners and before noon January 3rd, Rawlings filed a suit in the Campbell circuit court in which he sought to have the commissioners enjoined from enforcing the proceedings just taken, and to reinstate him as City Manager. On January 7, 1938, the four commissioners filed an affidavit in the case pending against them in the circuit court, attacking Rawlings in his capacity as City Manager. The motion for a temporary injunction was overruled by the court on January 13, 1938. Rawlings filed a motion with the Clerk of the Court of Appeals for a temporary injunction on January 18, 1938, together with a notice which had been accepted on January 14, 1938. On January 24, 1938, Chief Justice Stites entered an order directing that a temporary injunction be granted upon the ground that the suspension of Rawlings as City Manager without charges was illegal. On the morning of January 25, 1938, the circuit court of Campbell county entered an order reinstating Rawlings as City Manager of Newport. The Board of Commissioners met and reinstated Rawlings, and within an hour suspended him, the mayor voting "No."

In the meantime, the Board of Commissioners, pursuant to their decision to file charges against Rawlings, filed fifteen charges, with a number of exhibits, in the name of the Board of Commissioners. The charges were subscribed and sworn to by the four commissioners; the mayor not joining in the action. Rawlings was furnished with a copy of the charges. The notice set the public hearing for January 25, 1938, at 9 a. m. Counsel for Rawlings appeared at the hearing and objected

to the hearing at that time because of the conditions and events just reviewed, and moved that the hearing be set aside. The objection and the motion were overruled by the Board; the mayor voting "No."

Before the taking of evidence began, Rawlings filed 10 motions with reference to the charges, seeking to have certain ones made more definite and others to be quashed. All the motions, with the exception of one relating to charge 14, and another to make one charge more definite and certain, were overruled. Charge 14 was dropped from the list. All of the evidence taken before the Board was transcribed and it was agreed that this transcript of the proceedings should be official. Rawlings was given full opportunity to present witnesses in his own behalf. The hearing lasted from January 25th until ten o'clock in the evening of January 31, 1938, with some intermissions. At the close of the hearing the Board took the case under submission. On February 5, 1938, it convened at a special meeting with the official stenographer present, but without notice to Rawlings or his attorney. At this meeting a motion was offered and adopted to the effect, "that the charges be sustained; that John T. Rawlings be found guilty thereof, and that said John T. Rawlings be finally removed as City Manager of Newport, Kentucky." The four commissioners voted in favor of the motion and the mayor voted against it.

On April 21, 1938, Rawlings filed a petition in equity in the Campbell circuit court covering some 40 pages, including the charges, in addition to certain exhibits, and the transcript of evidence taken at the hearing before the Board of Commissioners. The petition reviewed the happenings in connection with Rawlings' removal up to that time. Appellant contended that his removal by the Board was arbitrary, and he asked that the court review the Board's action. In his prayer he asked that the action of the Board of Commissioners in removing him as City Manager be cancelled, set aside and held for naught; that the Board be enjoined to remove appellee, Morlidge, from the office of City Manager and to reinstate him, Rawlings, to the office; that the Board be enjoined from preventing him in discharging the duties of the office of City Manager; and that Morlidge be perpetually enjoined from setting up any claim to said office or the salary thereof, and from inter-

fering with him, appellant, in the performance of the duties of the office of City Manager. By amended petition Rawlings contended that the action of the Board of Commissioners in the hearing of the charges against him denied to him his rights under the statutes and under the Constitution of Kentucky, and also denied him due process of law and equal protection of law, and further deprived him of his rights under the 14th Amendment to the Constitution of the United States, U. S. C. A. Constitution Amendment 14. Appellees demurred to Rawlings' petition, and on August 2, 1938, the circuit court sustained the demurrer. Appellant's motion for a permanent injunction was overruled and his petition dismissed, to all of which he objected and excepted and prayed an appeal to this Court, which was granted. Judgment was entered accordingly in the circuit court, and from this judgment Rawlings appeals.

Appellant, Rawlings, urges reversal of the lower court's action because (1) the actions of the four commissioners prior to the hearing on January 25, 1938, show that they were prejudiced against him, and had so prejudiced the case that a fair trial for him was impossible; (2) the failure to administer an oath to the members of the Board before the hearing began was a fatal defect which would nullify the proceedings; (3) the proceedings before the Board denied Rawlings due process of law in that (a) the charges as a whole were insufficient, (b) there was no substantial evidence to support the removal, and (c) the failure of the Board to make any findings of fact, or to state under what charges it acted, made the removal void; and (4) the proceedings before the Board were conducted in such an unfair manner as to make the removal void.

Before passing to the more important issues, we will dispose of appellant's contention that the failure to administer an oath of office to the members of the Board before the hearing began was a fatal defect. In the case of Tompert v. Lithgow, 1 Bush 176, it was held that the Board of Aldermen of Louisville erred in not being duly sworn, as provided in the city charter, before sitting as a court to try charges against the mayor. The members of the Board were sworn, but not by an officer authorized to administer the oath, and the case was decided as if no oath had been taken. No such provision appears in the 1930 City Manager Act, Kentucky Stat-

utes, section 3235dd-1 et seq., nor elsewhere in the statutes concerning the governing of cities of the second class. The oath taken by the Commissioners when they assumed office was the only oath required of them, and it covered all of their various responsibilities and duties.

Section 3235dd-33 of the Statutes is the battle ground of this proceeding. This section is section 18 of Chapter 91, Acts 1930 (sometimes referred to hereinafter as the 1930 City Manager Act). This Act provides for the City Manager form of government in cities of the second class. The section is as follows:

"The city manager shall be chosen by the board of commissioners solely on the basis of his executive and administrative qualifications. The choice shall not be limited to inhabitants of the city or state. He shall be employed for an indefinite period. He shall be removable at will by the board of commissioners, but such removal shall not be effected by a reduction in the compensation of the city manager, and if removed at any time after having served for six months he may in writing demand written charges and a public hearing on the same before the board of commissioners prior to the date on which his final removal shall take effect, but during such hearing the board of commissioners may suspend him from office. Such public hearing shall be fixed by the board of commissioners not to exceed thirty days after such demand therefor. During the absence or disability of the city manager the board of commissioners shall designate some properly qualified person to perform the duties of the office. The city manager shall receive such compensation as may be determined by the board of commissioners."

In addition to the Rawlings proceeding before this Court in January, 1938, asking for a temporary injunction, we had this section before us in an injunction proceeding in 1936. The 1936 proceeding involved the right of the Board of Commissioners of the City of Paducah to remove the City Manager. Since the whole Court sat in the consideration of these two injunction proceedings and concurred in Judge Stites' conclusions on them, relating to the manner in which a city manager may be removed from office under section 3235dd-33, we deem it necessary here only to reaffirm those conclusions. In substance these conclusions are that: The

right to remove a city manager appointed under section 3235dd-33, once he has served in his office for a period of six months, must be for a good cause and for some legitimate reason. While the removal may take place at any time after the city manager has served for six months, he may, in writing, demand written charges and a public hearing on the charges before the Board of Commissioners prior to the date on which his final removal shall take effect. Once written charges and a public hearing have been demanded by a city manager, when there is an attempt to remove him from his office, the charges must be so prepared and a public hearing set by the Board of Commissioners within a period of 30 days after the demand therefor. When the charges are duly preferred the Board of Commissioners may suspend the city manager until such time as the hearing is concluded and he is finally removed or reinstated.

It follows that, when a city manager is duly suspended during the progress of a public hearing relating to his removal, the Board of Commissioners may designate an acting city manager. To hold otherwise would make possible a chaotic condition in the handling of the city's financial and administrative affairs under the city manager form of government.

While it is obvious from the record in this proceeding that the Board of Commissioners acted with considerable haste in attempting to get Rawlings out of office in January, 1938, we must conclude that the procedure outlined supra was complied with in a substantial manner, even though it appears that the procedure was more or less "forced" upon the Board of Commissioners. It is seen, therefore, that the hearing on the charges to remove appellant from office, which began on January 25, 1938, was in accordance with our interpretation of section 3235dd-33 of the statutes. Whether or not certain members of the Board of Commissioners, or all of them, were prejudiced against Rawlings, does not enter into the picture. Arbogast v. Weber, Mayor, et al., 249 Ky. 20, 60 S. W. (2d) 144. To hold otherwise would have the effect of virtually nullifying the right of the Board of Commissioners to remove the city manager from office.

Under the statutes the Board of Commissioners is vested with the ultimate control and management of the city's affairs. In brief, it is the policy making body.

Under the 1930 City Manager Act the Board is vested with the authority to appoint an official known as the city manager to act as executive agent for the Board. City of Lexington v. Thompson, 250 Ky. 96, 61 S. W. (2d) 1092. It is the function of the city manager to serve as the principal administrative and financial officer for the Board. Section 3235dd-34 of the statutes. It is his duty to initiate policies and procedures, and to execute them once approved by the Board. This arrangement in operating government recognizes governmental administration as a science and technique within itself. Indeed, it admits on its face that politically elected or appointed officials, whose integrity and honesty of purpose may be unquestioned, are frequently unsuited for administering and executing the highly complicated and involved problems of the modern city.

It is contended under the city manager form of government, and similar arrangements for carrying on government, that elective and appointive boards and commissions, while vested with the ultimate responsibility for controlling and managing the affairs of a city or other unit of government, can best serve the public if their functions are divorced from the purely administrative and routine duties. Under such arrangements experience has shown in a number of instances that the public interest can be better served and represented, not only because of the benefits coming from the services of an expert in directing the execution of policies and procedures, but also because the policy makers are in better position to bring into the picture the always necessary lay point of view of the public interest. In other words, it is argued that such an arrangement often helps to promote economy and efficiency by widening the area between "representing the people" and the actual administration and direction of the difficult and greatly complicated job of carrying on good government through the functioning of the various administrative techniques established. No clear-cut or hard and fast lines can be drawn between policy making in government and the carrying out of policies through administrative techniques. The dividing line between these two functions is often very narrow. Frequently there are overlappings between the two. It is all the more important, therefore, that there exist between the policy making body and its chief executive officer, as contemplated

by the 1930 City Manager Act, a most sympathetic, cooperative and straightforward atmosphere. Once this delicate balance is upset trouble is imminent.

To deny a policy making body such as the Board of Commissioners of the city of Newport the right to present charges and to hold a hearing on the removal of its principal administrative and executive officer when they think that something has gone wrong would go far toward destroying the purposes sought to be accomplished under the 1930 City Manager Act. If the mere charge of prejudice and bias on the part of the policy makers should be permitted to stop them from investigating conditions, which they deem wrong, and removing an official from office when there are causes sufficient, there would be fostered a condition never contemplated by section 3235dd-33 of the Statutes. It is to be presumed that officials representing the public are motivated by good faith, and this presumption must hold until definitely shown otherwise. A requirement that charges shall be preferred and a public hearing held in a proceeding to oust the city manager furnishes the public an opportunity to see whether its interests are being properly represented by the governing body of the city.

Broad powers must of necessity be given to the representatives of the modern American city in the carrying out of administrative proceedings of a quasi judicial nature; and, as contemplated under section 3235dd-33 of the Statutes on the question of removing a city manager from office, there must be a definite showing that the Commissioners have acted arbitrarily and capriciously before their actions will be overthrown. The record reveals that there was no such showing in the case at bar. Rawlings was given a full and fair hearing before the Board of Commissioners. The procedure adopted by the Board and followed by it and the City Solicitor did not violate in any substantial manner appellant's rights, nor was he denied due process of law.

This Court has frequently held in cases of this type, where the statutes make no provision for appeal from a removal proceeding, that the courts will review the proceedings and the procedure followed to determine whether an official has been removed through arbitrary or capricious actions of the tribunal vested with the

power of removal. In such instances the merits of a proceeding will not be considered by the court, nor is the court free to substitute its judgment and opinion for that of the tribunal vested with the power of removal. The review is directed toward the legal sufficiency of the charges made, and toward the character of the evidence produced, to determine whether it is of a substantial nature. The proceedings of the tribunal under review will not be measured according to the strict formalities of legal procedure. There must be, however, a definite showing of legally sufficient cause and substantial evidence before the ouster action will be upheld. Howard v. Bell County Board of Education, 247 Ky. 586, 57 S. W. (2d) 466; Henderson v. Lane, 202 Ky. 610, 260 S. W. 361; Stanley v. Fiscal Court of Hopkins County, 190 Ky. 495, 227 S. W. 813; Graham v. Jewell, 204 Ky. 260, 263 S. W. 693; Arbogast v. Weber, supra; Lyon v. Bell, 275 Ky. 69, 120 S. W. (2d) 752.

Once it has been determined that a cause against an official was legally sufficient, and that substantial evidence was presented thereunder, we have not been and are not now disposed to hold that a finding of fact by the tribunal exercising the power of removal of an officer was necessary in the absence of a specific statute to that effect. In instances where a series of charges are made, and substantial evidence presented under one or more of them, it is not necessary that the tribunal designate the action taken by it on each specific charge. See cases cited supra. It is significant that section 3235dd-45 of the Statutes, section 30 of the 1930 City Manager Act, provides that, where a member of the Board of Commissioners, or the mayor, is removed, there shall be findings of fact at the hearing, and that the reasons for removal shall be stated in writing and filed as a matter of public record. No such requirements are found in section 3235dd-33, section 18 of the 1930 City Manager Act, relating to the manner in which a city manager may be removed from office. It is obvious, therefore, from the wording of these two sections alone, that the legislature did not contemplate that there should be findings of fact and an enumeration of reasons for removal in the case of a city manager, as required in the case of the removal of a member of the Board of Commissioners or the mayor.

We have examined carefully all of the charges made

against Rawlings, and the evidence offered under them. We have noted appellant's criticisms that certain charges were not sufficiently specific, and that there were instances of vagueness and uncertainty. It is our view, however, that the transcript of evidence and the whole record show that the charges were so framed and worded that appellant was not taken by surprise nor misled as to the practice criticized. Indeed, the Board went into unnecessary detail in some instances, apparently in order to furnish a fair statement of the question involved. Other charges were amplified by exhibits. Appellant contends that some of the exhibits were not sufficiently clear and definite, but the record reveals that, when the time for taking proof came, he had little difficulty in understanding the practice toward which the charge was directed. In substance, the charges were as follows:

(1) Pursuant to Rawlings' orders, excessive sums were paid to certain city employees during the years 1936-1937.

(2) Only slips of paper setting forth lump sum department payrolls were presented to the Board for approval. Under this arrangement payments were made which were not authorized by Board ordinances. Requests of two Board members for copies of detailed payrolls were not complied with.

(3) Certain employees, including Rawlings, were paid in advance for services.

(4) The failure to transfer taxes due the Board of Education after they were collected and placed in the general fund of the city resulted in a suit by the Board of Education against the city for such funds. It was contended that lax business administration of the city's affairs under Rawlings was responsible for this condition.

(5) The budgets for 1936 and 1937 were overspent, and the floating indebtedness of the city materially increased during Rawlings' administration.

(6) An automobile contracted to be paid for from city funds by Rawlings was turned over to the mayor for his personal use.

(7) The auditor and the secretary of the legal de-

partment appointed by Rawlings were not competent to perform the duties of their respective offices.

(8) An assistant city solicitor, with the assistance of Rawlings' private secretary, used official stationery and supplies for political purposes.

(9) An excessive number of persons were appointed to the Department of Public Works for political purposes during October and November, 1937. The primary election was held October 16, 1937, and the general election on November 2, 1937.

(10) Commissioner Brœring's request of Rawlings for a financial analysis of delinquent taxes and water bills was not complied with.

(11) A proper and adequate accounting system in the Waterworks Department, installed before 1936, was abandoned and an inadequate system substituted therefor.

(12) Payments due the Sinking Fund of the city were in arrears to the extent of $44,166.86 on December 31, 1937. Amounts allocated to the Sinking Fund were not paid into the fund when the Sinking Fund tax was collected.

(13) Lack of cooperation, sympathy and understanding of the proper and efficient operation of municipal government on the part of Rawlings, as charged, made it necessary to create a Board of Inquiry. (Board of Commissioners' Resolution No. 279.)

(14) The conditions set out would cause lack of cooperation, harmony and confidence between Rawlings and the commissioners. (This charge was dropped.)

(15) The acts, omissions and policies of Rawlings, as charged, contributed to the depletion of the city treasury of the City of Newport, and said depletion made the general financial status of the city precarious, thereby making retrenchment necessary. (The depository bank was honoring only payroll checks the latter part of 1937.)

It is our conclusion that these charges meet the requirements set out above as to legal sufficiency. Our review of the transcript of the evidence shows that substantial evidence was presented against Rawlings under most of the charges; some evidence being presented

under each charge, with the exception of No. 14. We do not deem it necessary, therefore, to discuss in detail the evidence taken under all of the charges, because, as we have pointed out, it is not necessary to do so to uphold the Board's action in removing Rawlings. We will consider Charges 1, 2 and 3 together for the sake of brevity, and because these three charges deal primarily with the manner in which payroll funds were handled.

George F. Meister served during the Rawlings regime as a special assistant in the finance department of the city. Prior to the time Rawlings took office, Meister served as auditor. The salary of the auditor under the ordinance salary schedule adopted by the Board of Commissioners (Ordinance No. 1, January 4, 1932, and amended February 23, 1933) was $2,400 annually, or $200 per month. Under section 12 of the ordinance the city manager could appoint other agents and employees in administrative departments at a maximum salary of $180 per month. Meister continued to draw $200 per month as a special assistant; whereas, the highest salary he was supposed to have drawn under section 12 of the salary schedule was $180 per month.

During the month of December, 1937, Meister and Miles A. McIntyre, director of finance and city treasurer, were paid $200 and $233.42 respectively for "extra services, 1936-1937," in addition to their salaries for the month of December, 1937. An attempt was made to justify the payments on the ground that neither of these officials had taken vacations in 1936 and 1937. Meister testified that he had not taken a vacation since he came with the city in 1932, but that December, 1937 was the first time he had been paid extra for a vacation period he had not taken. The city solicitor contended that no vacation provision appeared in the salary schedule ordinance for administrative employees, while appellant sought to show that it was customary for these employees to take two weeks' vacation each year with pay. Be this as it may, there was no justification for an attempt to pay an employee for a vacation period not taken. This constituted double payment for a particular period of time.

By Ordinance No. 213, adopted April 14, 1936, the Board of Commissioners directed the city manager to cause to be prepared for publication a compilation of all ordinances and resolutions of a public nature in force in

Newport. The city manager was authorized to employ a competent attorney for this job, and also to employ a typist to do the necessary typing in connection with the codification work. Sections 2 and 3 of Resolution No. 213 are as follows:

"2. The City Manager shall also be authorized to employ a typist to do the necessary typewriting therefor, who shall be paid not in excess of the customary charges therefor.

"3. Said compensation shall be paid by warrants issued by the City of Newport, payable to said persons so employed upon statements made by them to the City of Newport of the work done, which statements shall be approved by the City Manager."

It appears that a special stenographer was employed for a short time to do the work referred to in Resolution No. 213, but later Rawlings authorized Wm. J. Higgins, city clerk, to do the typing work. Higgins' annual salary was $1,800. He was paid $487.50 during 1937 for the special typing work, in addition to his regular salary. During a part of the time Higgins was drawing special pay the attorney in charge of the codification work was assisted by a stenographer employed at the City Hall. The Higgins special payment vouchers had slips of paper attached to them written out in pencil in the form of City of Newport to William Higgins typing ordinance (Date inserted)." Each one of them was for $37.50. Two of the slips showed the notation "O. K. John T. Rawlings," but no approval appeared on the voucher at the bottom on the line headed "Approved for payment: ————, City Manager." Rawlings testified, however, that he saw the Higgins bills for special typing and for copying ordinances and approved them "without any handwriting." He testified also that he approved some of the regular payrolls without "signing them." Rawlings actually approved vouchers by signing them only occasionally. In this connection, the name of the auditor, Richard Hagen, was often stamped in the space provided for his signature. Several of the Higgins special vouchers were so stamped. It was shown that in many instances detailed payroll data were not submitted to the Board of Commissioners for approval along with the summary sheet setting forth the total payroll for a department.

Certain employees were permitted to draw their salaries in advance of the time the services were rendered. One employee drew $300 in advance payments before further advances were denied. Rawlings drew his full December, 1937, salary at the first of December. His explanation was that he had not taken a vacation in 1936 or 1937 up to the first of December, 1937, and that he drew his full December salary with the idea of taking a vacation. He did not take the vacation, however, and this advance payment constituted his December, 1937, salary. It was not contended in the Rawlings instance, or in the other instances of advance payments, that any over payments were made. The advancements appear to have been accounted for and made up by the end of the year in which they were drawn. This privilege of salary payments in advance was not granted to all employees. The practice showed laxity in the handling of public funds. The very nature of a public fund is such that the safeguards surrounding it must always be equal to or greater than those surrounding a private fund. Rawlings and other witnesses attempted to show that some of the practices discussed herein took place without his knowledge or consent, but the chief administrative and financial officer of a city (the city manager in this case) cannot be excused for the unbusinesslike and questionable practices of his appointees in handling payrolls. It is apparent, therefore, there was sufficient substantial evidence presented under Charges 1, 2 and 3 to uphold the Board's order in removing Rawlings.

In conclusion we will review briefly some of the evidence presented under charges 5 and 12, relating respectively to the budget and the sinking fund, to determine its "sufficiency" and "substantialness." Section 3235dd-37 of the Statutes provides that once each year the city manager shall prepare and submit to the Board of Commissioners a budget for the ensuing fiscal year. The budget is supposed to contain an itemized statement of the appropriations recommended by the city manager for current expenses and for permanent improvements of the city's departments, showing comparative statements of appropriations and expenditures for the current and next preceding fiscal year. There must be an itemized statement of taxes required to meet the appropriations in the budget, and an estimate of the city's other revenues. In this instance also there is supposed

to be a comparative statement of the taxes and other revenues for the current and next preceding fiscal year. It is also provided that the budget shall contain a statement of the financial condition of the city and such other information as may be required by the Board of Commissioners.

Section 3235dd-38 provides that the Board of Commissioners shall pass an annual appropriation ordinance based upon the budget submitted by the city manager. The total amount of the appropriations shall not exceed the estimated revenues. It is also provided that, "No other liabilities shall be incurred by any officer or employee of the city, except in accordance with the provisions of the annual appropriation ordinance, or under continuing contracts and loans authorized under the provisions of this charter."

Sections 3190 and 3191 of the Statutes provide for the manner in which sinking funds in second class cities shall be handled, and set out the duties of the governing bodies of such cities in relation thereto.

The evidence presented under these charges showed that the budget of the city was not prepared in accordance with section 3235dd-37 of the Statutes. It made no reference to the financial condition of the city reflecting the 1936 deficit. In submitting the proposed budget to the Board on March 16, 1937 (approximately six weeks after the Ohio River flood waters had subsided) Rawlings said:

"In preparation of the Budget, tax delinquencies and general decrease in revenue have been considered, together with the extraordinary expenses incurred as a result of the flood. While some of these expenditures must of necessity be estimated, only those essential to the operation of the various departments of the City will be made."

The 1937 budget ordinance (No. 171) made no separate provision for flood expenses. Rawlings attempted to justify the 1937 budget overrun in a sum considerably in excess of $200,000 (an amount in excess of the amount charged in Charge No. 5) largely because of the damages caused by the flood. When the budget was prepared a good part of the "extraordinary" flood expenses had been incurred. It was reasonable to presume under the circumstances that the budget prepared

by Rawlings provided for all 1937 expenditures. Section 5 of the 1937 Budget Ordinance (No. 171) provided:

"That no other liabilities for and on behalf of the City of Newport, Kentucky, shall be incurred by an officer or employee of said City, except in accordance with the several provisions of this Ordinance, or under continuing contracts authorized by ordinance and under the provisions of the general laws of the Commonwealth of Kentucky."

The record does not reveal any report or request to the Board on the part of Rawlings for authority to incur expenditures for a budget unit in excess of the amount appropriated to it as provided in section 3235dd-38 of the Statutes. The claim that certain good and needed permanent improvements were made was no valid excuse for exceeding the budget. Nor does the fact that the excess expenditures were later held to be valid obligations of the city excuse the violation of the budget statute and the budget ordinance.

The budget and the revenue ordinance provided for a tax of .316 cents for sinking fund purposes. This tax was collected as a part of the total tax rate of $1.73. Instead of paying funds into the sinking fund, for which a separate depository was maintained, as tax collections were made, it was not until late in December, 1937, that any monies were transferred from the city's general fund to the sinking fund account. On December 31, 1937, the total payments into the sinking fund were $44,161.86 less than the amount allocated to the fund, and there was not sufficient money in the general fund to make up this deficit. While it was shown that tax delinquencies in 1937 were substantial, and that certain franchise taxes due in 1937 were not collected until January, 1938, these facts of themselves do not constitute an explanation for the failure to transfer any tax monies to the sinking fund when they were collected. This does not mean that the monies should have been transferred to the sinking fund depository from the general fund depository the day they were collected, but rather that the transaction should have taken place within a reasonable period of time. Rawlings' attempts to show that he was not personally responsible for the conditions brought to light under Charges 5 and 12

formed no satisfactory basis for the conditions, in view of the fact that he was the duly appointed executive agent for the Board of Commissioners.

During December, 1937, the city was behind with its bills. Certain budget appropriations for 1937 had been greatly exceeded. Rawlings, according to his testimony, had planned to take a month's vacation and drew his December, 1937, salary in advance for that purpose. Payments in excess of regular salaries had been made late in December, 1937, to certain employees for vacation periods not taken. Certain employees had been permitted to draw parts of their salaries in advance of services rendered. The city was in arrears in payments due the sinking fund. Conditions in the city's management were such late in 1937 as to justify the conclusion that its financial affairs were in a bad way. With these conditions in mind, it can be seen that the Board of Commissioners had some grounds for believing that they were justified in taking speedy steps to remove Rawlings in January, 1938.

As stated before, it is not for us to determine whether, under all the circumstances, Rawlings should have been removed from office. It is enough that there were legally sufficient charges and substantial evidence to support those charges. The discretion to act or not to act belonged to the Board of Commissioners and, once the premise for action has been established, we will not interfere to control a discretion that is given to the Board of Commissioners and not to the courts. The very essence of a right to exercise a discretion is a right to make an honest mistake as well as a right to make a sound decision. Bancamerica-Blair Corporation et al. v. State Highway Commission et al., 265 Ky. 100, 95 S. W. (2d) 1068. In a proceeding of this type we will not substitute our judgment for that of the tribunal vested with the power of removal. Under the circumstances, the correctness of the conclusion drawn rested with the Board of Commissioners.

For the reasons given herein it is our conclusion that the judgment of the lower court should be, and it is, affirmed.